STATE OF CONNECTICUT *v.* GEORGE SILVEIRA
(12063)

HEALEY, SHEA, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued November 15, 1985—decision released January 28, 1986

*Louis S. Avitabile,* for the appellant (defendant).

*John F. Droney, Jr.,* special assistant state's attorney, with whom were *Bradford J. Ward,* assistant state's attorney, *Thomas Farrell,* certified legal intern, and, on the brief, *John A. Connelly,* state's attorney, for the appellee (state).

DANNEHY, J. The defendant was tried by a jury, convicted of manslaughter in the first degree with a firearm, in violation of General Statutes § 53a-55a, and committed to the custody of the commissioner of cor-

rection for a term of eight to sixteen years. He claims on appeal that the trial court erred: (1) in refusing his request to charge on the defense of mistake of fact; (2) in charging incorrectly on self-defense and defense of others; and (3) in restricting the defendant's direct testimony as to his state of mind at the time of the shooting. We agree with the defendant only as to his third claim of error, but conclude that the error was harmless and had no significant effect in bringing about the verdict. Thus, we affirm his conviction.

It appears from the evidence that on March 21, 1981, shortly after 2 a.m., the defendant and several companions drove to a place called the Standing Room Only Bar in Waterbury. They had heard that some of their friends were in trouble inside the bar, and had come to assist them. Upon their arrival, the group of approximately six young men got out of their automobiles and stood across the street from the Standing Room Only Bar. Two of them, Americo Magalhaes and Carlos Montiero, entered the bar to check on their friends. They found that their information was incorrect and that their friends were not in trouble. Montiero went back outside to inform the others while Magalhaes remained in the bar to drink and talk with a friend.

The defendant and his companions waited for Magalhaes to leave the bar. Soon they noticed Clint Flammia walking toward the bar entrance. There was testimony that the defendant's group knew Flammia from a previous incident. Flammia and the defendant's group began to trade insults across the street. Before long an object, possibly a bottle, was hurled in Flammia's direction. After Flammia entered the bar, Peter Francisco, who had driven the defendant to the Standing Room Only Bar, moved his car to ensure that "in case of a quick getaway I'd be able to get out of there fast."

Meanwhile, Flammia, Bob Perugini and about ten other young men came through the front door of the bar and started crossing the street toward the defendant and his companions. The defendant was armed with "nunchackus," a martial arts weapon consisting of two wooden sticks joined by a metal chain. The defendant shouted at the advancing group to halt. He then produced a handgun and fired two shots over their heads in order to scare them. Perugini told Flammia that the defendant was only shooting blanks, and, as the crowd continued to advance, the defendant and his friends quickly retreated to their automobiles. The defendant, Montiero and Francisco got into Francisco's car and locked the doors. They then noticed Magalhaes, who had left the bar, trying to make his way through the crowd toward them. When Magalhaes reached Francisco's car he was surrounded by Flammia, Perugini and several others, who began to punch and beat him about the face and body. When Magalhaes fell to the ground his assailants continued to kick and stomp on his ribs, head and back.

The defendant, Montiero and Francisco decided to assist Magalhaes. Montiero got out of the car and immediately was struck on the head with a thick stick, and went running down the street. The defendant, concerned for Magalhaes' safety and seeking an immediate end to the beating being administered to him, again produced his handgun. The defendant testified that he fired a single shot at close range one to one and one-half feet to the right of the victim, Greg Lavorgna, who was standing with his back to the defendant on the extreme right of the group which tightly encircled Magalhaes. The defendant further testified that he did not intend to hit anybody, but considered it necessary to aim his gun closely enough to allow Magalhaes' assailants to hear the bullet whiz by, so that they would realize that he was not merely firing blanks. Accord-

ing to the defendant, just as he was about to pull the trigger, the victim moved slightly to his right and into the path of the bullet. Pathological examination of the victim established that the bullet entered his body through the right shoulder blade, lodging in his heart, and causing death. Additional relevant facts adduced at trial will be discussed as we consider the various issues raised by the defendant.

I

We first address the defendant's claim that the trial court erred by refusing his request to charge the jury on the defense of mistake of fact under General Statutes § 53a-6 (a) (1) and (3). That statute provides, in pertinent part, that "[a] person shall not be relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief of fact, unless: (1) Such factual mistake negates the mental state required for the commission of an offense . . . or (3) such factual mistake is of a kind that supports a defense of justification." We find this claim to be without merit.

We begin by noting that the defendant was charged with manslaughter in the first degree with a firearm. General Statutes § 53a-55a. That statute incorporates the provisions of General Statutes § 53a-55 (a), which contains three subsections.[1] Because the jury returned

---

[1] "[General Statutes] Sec. 53a-55a. MANSLAUGHTER IN THE FIRST DEGREE WITH A FIREARM: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. No person shall be found guilty of manslaughter in the first degree and manslaughter in the first degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information.

"(b) Manslaughter in the first degree with a firearm is a class B felony

a general verdict of guilty against the defendant, we must analyze the defendant's claim with respect to each of the subdivisions of General Statutes § 53a-55 (a) under which he might have been convicted. See *State v. Reid,* 193 Conn. 646, 666, 480 A.2d 463 (1984); *State v. Marino,* 190 Conn. 639, 650–51, 462 A.2d 1021 (1983). We may eliminate completely from our consideration subdivision (2) of General Statutes § 53a-55 (a), because the trial court did not instruct the jury under that subdivision and thus there is no possibility that the defendant was found guilty under it. Therefore, we consider the defendant's claim that he was entitled to an instruction on mistake of fact only insofar as it relates to his possible conviction under subdivisions (1) and (3) of General Statutes § 53a-55 (a).

General Statutes § 53a-55 (a) provides, in pertinent part, that "[a] person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person . . . or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death

for which one year of the sentence imposed may not be suspended or reduced by the court."

"[General Statutes] Sec. 53a-55. MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person.

"(b) Manslaughter in the first degree is a class B felony."

to another person, and thereby causes the death of another person." Our statutes provide by definition that "[a] person acts 'recklessly' with respect to a result . . . when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur . . . . The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ." General Statutes § 53a-3 (13).

## A

The defendant posits two factual theories which he claims entitled him to an instruction on mistake of fact. We consider each separately. He predicates his first claim on General Statutes § 53a-6 (a) (1) which provides for the defense of mistake of fact where "[s]uch factual mistake negates the mental state required for the commission of an offense." The defendant admits that he fired a shot less than two feet to the right of the victim, who stood on the extreme right of the group of men attacking Magalhaes. The defendant argued at trial that he intended only to scare the attackers away, and that he did not intend to hit any of them. He claims, however, that he did not know, when he fired the fatal shot, that the victim would move slightly to his right and into the path of the bullet which struck him. In essence, the defendant's first claim of mistake of fact, under General Statutes § 53a-6 (a) (1), is premised on his mistaken belief that the victim would stand still.

A mistake of fact results "when one makes an erroneous perception of the facts as they actually exist." *State* v. *Gonzales,* 99 N.M. 734, 737, 663 P.2d 710, cert. denied, 464 U.S. 855, 104 S. Ct. 173, 78 L. Ed. 2d 156 (1983). The defense arises only where the defendant misperceives an objective state of existing fact, and does not apply to the defendant's erroneous supposi-

tions as to the unformed intentions of another. A fact is that which has taken place, not something that might or might not take place in the future. See generally *State* v. *Bougneit,* 97 Wis. 2d 687, 294 N.W.2d 675 (1980). We do not attempt to delineate the many situations where an instruction on mistake of fact might be appropriate under General Statutes § 53a-6 (a) (1). We only hold that the type of "mistake" alleged here is not among them.

Almost any accident may broadly be viewed as having been caused by a mistake of one form or another. It might be said of an individual struck by lightning that he made a "mistake" in positioning himself where he did. The defendant's claim to a mistaken belief that the victim would stand still is merely a sophistic way of saying that he did not intend to commit the crime with which he was charged. "Instead of speaking of ignorance or mistake of fact or law as a defense, it would be just as easy to note simply that the defendant cannot be convicted when it is shown that he does not have the mental state required by law for commission of that particular offense." LaFave & Scott, Criminal Law § 47, pp. 356–57; see *State* v. *Tedesco,* 175 Conn. 279, 288, 397 A.2d 1352 (1978). The defendant's claim that he did not know beforehand that the victim would unexpectedly cross into his line of fire is more appropriately addressed to the question of his intent to cause serious physical injury under General Statutes § 53a-55 (a) (1). This claim, very much like the defense of accident, "is not a justification for a crime. Unless the state has met its burden of proving each element of the crime beyond a reasonable doubt, no finding on the issue of justification is necessary." *State* v. *Miller,* 186 Conn. 654, 665, 443 A.2d 906 (1982).

We have held that when a defendant "admits the commission of the crime charged but seeks to excuse or justify its commission so that legal responsibility for

the act is avoided, a theory of defense charge is appropriate." *State* v. *Rosado,* 178 Conn. 704, 707, 425 A.2d 108 (1979). In the present case, the defendant's claim of an innocent intent, if accepted by the jury, would negate an essential element of the crime and mandate a verdict of not guilty. This defense is intrinsically factual, however, and not of the type which we have held to require a distinct instruction as part of the trial court's charge. A general "claim of innocence or a denial of participation in the crime charged is not a legally recognized defense and does not entitle a defendant to a theory of defense charge." Id. A theory of defense instruction is appropriate, upon proper request; *State* v. *Preyer,* 198 Conn. 190, 199, 502 A.2d 858 (1985); only when evidence supporting a "legally recognized defense" is placed before the jury. *State* v. *Cassino,* 188 Conn. 237, 243, 449 A.2d 154 (1982); *State* v. *Rosado,* supra; see *State* v. *Harris,* 189 Conn. 268, 274, 455 A.2d 342 (1983). The defendant's claim, although fashioned in terms of mistake of fact, is in reality nothing more than a denial of the intent to cause serious physical injury required for conviction under General Statutes § 53a-55 (a) (1). Because this is not a "legally recognized defense" under our law, the trial court did not err in denying his request to charge on mistake of fact under General Statutes § 53a-6 (a) (1).

We also consider briefly the defendant's claim as it applies to subdivision (3) of General Statutes § 53a-55 (a). That subdivision proscribes reckless conduct "which creates a grave risk of death to another person" under circumstances "evincing an extreme indifference to human life." The intent to cause serious physical injury is not an element of subdivision (3), and therefore, the defendant's claim that he did not intend to shoot the victim would not be a defense to a prosecution under that subdivision. We conclude that, insofar as the

defendant may have been found guilty under General Statutes § 53a-55 (a) (3), the trial court did not err in refusing to charge the jury on mistake of fact in accordance with the defendant's theory advanced under General Statutes § 53a-6 (a) (1).

## B

We next address the defendant's claim that the trial court erred in refusing to instruct the jury on mistake of fact under General Statutes § 53a-6 (a) (3). That statute provides: "A person shall not be relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief of fact, unless . . . (3) such factual mistake is of a kind that supports a defense of justification." In this regard, defense counsel argued that the defendant would have been justified under General Statutes § 53a-19 in using deadly physical force against the victim if he reasonably believed that the victim was part of a crowd that was inflicting or about to inflict great bodily harm on Magalhaes. The state's attorney had contended that the defense of justification by defense of others would not be applicable in the case because no evidence had been introduced that the victim had *actually* inflicted bodily harm on Magalhaes.[2] Defense counsel correctly

---

[2] The state's attorney argued as follows:

"Yes, if your Honor please, the evidence as I recall it revealed that [the victim] was in a motor vehicle operated by Ferrare when it passed the scene and saw Flammia and Perugini in the road and went up to the cemetery and the three men exited the vehicle, one was [the victim], one of them was Dufour and one of them was Murray. Ferrare subsequently stayed in the cemetery and went back to his car. There is no evidence at all from any of the witnesses, your Honor, that indicates that [the victim] had any weapon of any kind in his hand. Indeed many of the witnesses said they didn't even know who [the victim] was after his body was discovered on the church lawn. In addition, your Honor, Mr. Magalhaes did not say that [the victim] kicked or hit him in any fashion. He identified Mr. Perugini and somebody else identified Mr. Flammia as having hit Mr. Magalhaes but in any event no one identified [the victim] as having hit, struck Mr. Magalhaes, including Mr. Magalhaes which I think is very important. Sec-

maintained that the issue under General Statutes § 53a-19 (a) was whether the defendant reasonably believed that the victim was one of the attackers, and, thus, that the defendant would not lose the benefit of justification by defense of others merely because no direct evidence had been introduced that the victim had *actually* inflicted bodily harm on Magalhaes. In this context, counsel requested a theory of defense instruction, under General Statutes § 53a-6 (a) (3), that a reasonable mistake as to whether the victim was one of Magalhaes' assailants would not deprive the defendant of his defense of justification under General Statutes § 53a-19 (a).[3]

The trial court, attempting to clarify counsel's argument, expressed the opinion that any mistake in this context was necessarily included within the purview of General Statutes § 53a-19 (a), which provides, in pertinent part, that "a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the

---

ondly, your Honor, the Defendant's claim that he saw a group at or near or around Magalhaes and he said [the victim] must have been kicking him and then on further questioning: well, did you see him? No, I didn't see him, he must have been. How do you know he must have been? Well, he was standing there. So it's a strict guess, conjecture, assumption on his part that [the victim] was a possible attacker of Mr. Magalhaes."

[3] Defense counsel claimed: "The mistake of fact is that there is no evidence here besides the Defendant's testimony that [the victim] was or was not acting in such a manner, so what the mistake of fact does is if the jury finds that, one, there were one or more persons who were actually inflicting or about to inflict bodily harm on Mr. Magalhaes and, two, that it reasonably appeared to the Defendant that [the victim] was one of those persons who were inflicting or about to inflict great bodily harm on Mr. Magalhaes, then the Defendant because of the combination of mistake of fact and [defense of another] would be entitled to shoot one to one and a half feet to the right of [the victim]. . . ."

actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

We agree with the trial court that General Statutes § 53a-19 (a) embraces a reasonable mistake of fact of the type asserted by the defendant in this claim of error.[4] The trial court charged, in reference to the defendant's belief in the necessity of using deadly physical force: "Now he may be wrong in such belief, but if it has a reasonable basis, if he has a reasonable basis to believe that an assault against himself or against Mr. Magalhaes was about to take place and that the actors were about to use deadly physical force or force capable of inflicting great bodily harm, he is justified in using deadly physical force . . . ." We believe the trial court's charge was correct in law, adapted to the issues and sufficient for the guidance of the jury. There is no error in the refusal to charge on mistake of fact under General Statutes § 53a-6 (a) (3).

---

[4] In argument before the trial court, defense counsel appeared to recognize clearly that General Statutes § 53a-19 (a) embraced a reasonable mistake as to whether the victim was one of Magalhaes' assailants. He argued, however, that notwithstanding General Statutes § 53a-19 (a), the defendant was entitled to an additional instruction under General Statutes § 53a-6 (a) (3), by virtue of its having been enacted. The colloquy follows:

"Mr. Avitabile: [General Statutes § 53a-19 (a) provides in pertinent part] that deadly physical force may not be used unless the actor reasonably believes that such other person is using or about to use deadly physical force or is inflicting or about to inflict great bodily harm. That statute does not say unless such other person is using, it says the actor or defendant reasonably believes that he is using. *That statute in itself makes room for mistake of fact.* Then when you read that in combination with 53a-6 they have to be worked in combination because you can't say that the legislature passed that statute for no reason.

\* \* \*

"The Court: Doesn't this argument you're talking about go to justification rather than mistake?

"Mr. Avitabile: If your Honor would turn —

"The Court: They are going to determine whether or not he is credible, number one, and number two, what his reasonable belief was.

"Mr. Avitabile: There is a problem, though, tell me why, turn to 53a-6 (3) and tell me why that's there in the statute.

## II

We next consider the defendant's various claims that the trial court erred in its instructions to the jury on the issue of justification. The defendant, in his written request to charge, requested the trial court to instruct the jury: (1) on self-defense and defense of others as provided in General Statutes § 53a-19 (a); (2) on the duty to retreat as provided in General Statutes § 53a-19 (b); and (3) on the law relating to provocation and aggression as provided in General Statutes § 53a-19 (c). While not adopting verbatim the defendant's requests, the court charged on the statutory elements of the defense of justification by self-defense and defense of others. Thereafter, the jury, during its deliberations, requested the trial court to reread the portion of its charge concerning justification. At this point, defense counsel asked the court to instruct the jury to disregard the theory of self-defense, and to

---

"The Court: 53a-6.

"Mr. Avitabile: 53a-6 (a) (3), tell me why that's there in the statute, your Honor.

"The Court: Wait a minute, let me look at it first.

"Mr. Avitabile: Just because there is no law on it, it doesn't mean it isn't there for a purpose." (Emphasis added.)

Defense counsel also argued to the trial court: "[The defendant] said things on direct examination, he said things on cross-examination, but the result of what he said was, when I fired a shot it appeared to me, I assumed, it appeared to me that he, he described all of the action that took place before he fired the shot, which we won't go into with Mr. Monteiro getting hit, I'll go into that in front of the jury, he described all of the action that took place, that he saw at that point, he said he fired a shot because of what he saw and he had seen people kicking him, legs going in the air, he assumed they were all doing the same thing *and the jury has to decide whether he was reasonable in assuming that and if he was reasonable in assuming that one or more of them were . . . inflicting or about to inflict great bodily harm he's got a defense to the case whether you call it self defense, defense of others, mistake of fact, he is certainly entitled to that defense.* I'm just pointing out the specific statute that says that any mistake of fact which tends to support justification relieves one of criminal liability." (Emphasis added.)

modify its charge with respect to defense of others. The defendant claims error in the trial court's refusal to comply with these requests.

A

The defendant's claim that the trial court erred in refusing his belated request to reinstruct the jury that self-defense should no longer be considered is without merit. While recognizing that instructions that misstate the statutory defense of self-defense may "unconstitutionally implicate a defendant's due process right to establish a defense"; *State* v. *Preyer*, supra, 198; *State* v. *Corchado*, 188 Conn. 653, 660, 453 A.2d 427 (1983); we have held that "error induced by an appellant cannot be a ground for reversal and will not be reviewed. *State* v. *Ross*, 189 Conn. 42, 47, 454 A.2d 266 (1983); *State* v. *Kish*, 186 Conn. 757, 769, 443 A.2d 1274 (1982)." *State* v. *Hinckley*, 198 Conn. 77, 81 n.2, 502 A.2d 388 (1985). We are particularly ill-disposed to find harmful error where the trial court instructs the jury in the language of the applicable statute and in substantial conformity with the defendant's request to charge.

In this case the trial court, over the state's objection, charged the jury on self-defense as requested by the defendant. The court expressed its doubt that such a defense was supported by the evidence, instructing the jury: "Now, it will of course be up to you to determine whether [the defendant] himself at any time during the confrontation was under attack or threat of attack by deadly physical force which would have justified his use of deadly physical force to protect his own safety. The evidence to substantiate that he himself was confronted by deadly physical force would appear to be, to the Court, to be lacking or to be minimal at least, but this will be for you to decide." We might consider the defendant's claim of error had the trial court, in the absence of a request to charge, undertaken sua sponte

to instruct the jury on self-defense and thereupon mis-
stated the elements of General Statutes § 53a-19. *State
v. Preyer,* supra; *State v. Corchado,* supra; see *State
v. Rodgers,* 198 Conn. 53, 56, 502 A.2d 360 (1985).
Here, however, the court's charge mirrored the statu-
tory language. Moreover, the trial court clearly
informed the jurors that they were free to accept or
reject the defense of self-defense as they found the evi-
dence warranted. We do not believe that the defend-
ant suffered any prejudice as a result of this additional,
albeit superfluous, defense being placed before the jury.
We conclude that it is not reasonably possible that the
jury could have been misled by the court's instruction
on self-defense. *State v. Sinclair,* 197 Conn. 574, 581,
500 A.2d 539 (1985); *State v. Smith,* 194 Conn. 213,
219, 479 A.2d 814 (1984).

B

The defendant also claims error in the trial court's
refusal to modify its charge on defense of others. As
noted, the jury, during its deliberations, asked the court
to reread its charge on justification. Defense counsel
then requested that the court modify its charge by
instructing the jury that the exceptions to defense of
others, as set forth in General Statutes § 53a-19 (c),[5]
must be considered from the perspective of the
defendant.

---

[5] "[General Statutes] Sec. 53a-19. USE OF PHYSICAL FORCE IN DEFENSE
OF PERSON. (a) Except as provided in subsections (b) and (c) a person is
justified in using reasonable physical force upon another person to defend
himself or a third person from what he reasonably believes to be the use
or imminent use of physical force, and he may use such degree of force
which he reasonably believes to be necessary for such purpose; except that
deadly physical force may not be used unless the actor reasonably believes
that such other person is (1) using or about to use deadly physical force,
or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a), a person is not justi-
fied in using deadly physical force upon another person if he knows that
he can avoid the necessity of using such force with complete safety (1) by
retreating, except that the actor shall not be required to retreat if he is

Subsection (c) of General Statutes § 53a-19 provides in pertinent part: "Notwithstanding the provisions of subsection (a), a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor . . . or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law." Subsection (a), in setting forth the general rule when the use of force is justified, does not textually differentiate between self-defense and defense of others. Consequently, by the terms of the statute, the use of force in self-defense or defense of another is never justified where the conditions set forth in subsection (c) are found to exist.

The defendant acknowledges that the exceptions of provocation, aggression and combat by agreement as specified in General Statutes § 53a-19 (c) may properly deprive a defendant of the right to rely on self-defense. He contends, however, that those exceptions are wholly inapplicable, under the common law as well as under the statute, to defense of others. *State* v. *Shaw*, 185 Conn. 372, 379, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982).

in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a), a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

We do not agree. Subsection (a) of General Statutes § 53a-19 begins with the proviso "Except as provided in subsections (b) and (c)" and then proceeds to set out the standard by which the use of force may be justified. We read this proviso to make subsection (a) expressly subject to subsections (b) and (c). Moreover, as if the proviso in subsection (a) were not sufficient to convey this idea, the legislature chose to begin both subsections (b) and (c) with the additional proviso, "[n]otwithstanding the provisions of subsection (a)," before setting forth the conditions where the use of force would not be justified. We find it difficult to conceive what more the legislature could have done to manifest its intent that the use of force in self-defense or defense of another, as provided in subsection (a), is not justified where a defendant has engaged in the conduct described in subsection (c). The issue under subsection (c) is not whether the defendant reasonably believed that he provoked the use of force, or that he was the initial aggressor, or that there existed an agreement to engage in combat. The issue, rather, is whether the defendant *did* provoke the use of force, or *was* the initial aggressor, or *did* agree to engage in combat. The trial court did not err in refusing to instruct that the exceptions of provocation, aggression and combat by agreement must be considered from the perspective of the defendant.[6]

---

[6] The defendant does not claim error in the trial court's charge with respect to the duty to retreat set forth in General Statutes § 53a-19 (b). See footnote 5, supra. We recognize that our disposition of the defendant's claims regarding the exceptions enumerated in subsection (c) may be understood to apply as well to the duty to retreat set out in subsection (b). We caution that our holding is strictly limited to the facts of this case. An interpretation of subsection (b) requiring a defendant acting in defense of another to retreat, without regard to the ability to retreat of the person defended, would be inconsistent with the general right to defense of others set forth in subsection (a). In this case the trial court interpreted the phrase "with complete safety," as employed in subsection (b), to include the safety of the person defended.

## C

The defendant also claims that the trial court should not have instructed the jury on the exception of combat by agreement, as provided in General Statutes § 53a-19 (c). His claim is based on the fact that all of the witnesses who testified at trial specifically denied that there had been an agreement between the defendant, his companions and their adversaries to engage in combat on the evening of the incident in question. He concludes that the denial by the actual participants of any agreement precludes a jury finding that such agreement may, in fact, have existed. We do not agree.

The agreement required by General Statutes § 53a-19 (c) (3) need not be formal or express. The defendant himself testified that he and his companions went to the Standing Room Only Bar on the evening of this incident to assist friends who they had heard were in trouble. There was testimony that the defendant's group, while congregated in front of the bar, became embroiled in an altercation with Flammia. Other testimony indicated that the defendant's group had been involved with Flammia before. In apparent response to this altercation, Flammia entered the bar and returned shortly with companions of his own. Flammia's crowd then proceeded to converge on the defendant's group, with the resulting acceleration of hostilities which culminated in this tragic incident. While direct evidence of agreement may have been lacking, we find the evidence sufficient to support a reasonable inference that the physical force employed by the defendant "was the product of a combat by agreement not specifically authorized by law." General Statutes § 53a-19 (c) (3). There is no merit in this claim of error.

## III

We next address the defendant's claims that the trial court erred in two interrelated rulings on the admissi-

bility of evidence. We agree with the defendant that the trial court erred in both rulings. We will first consider each claim separately, identifying the specific error committed. Because the errors are so closely related, however, we treat them together in assessing their effect on the fairness of the defendant's trial, and in determining whether reversal is required.

A

The defendant's first evidentiary claim must be placed in context. The defendant testified on direct examination that while he and his companions waited outside the bar for Magalhaes to join them, Flammia arrived and an altercation ensued. Flammia entered the bar and returned shortly, accompanied by Perugini and approximately ten other men. As this group advanced toward the defendant and his companions, the defendant testified that he fired two warning shots over their heads. Defense counsel then asked the defendant what happened next. The defendant replied, "Mr. Perugini said something to me." Outside the presence of the jury the defendant was allowed to testify, for the record, as to the content of Perugini's statement. According to the defendant, after he fired the two warning shots over the crowd, Perugini told him: "If you shoot me you better kill me." The trial court disallowed this statement on the grounds that it was hearsay.

On redirect examination, defense counsel renewed his efforts to introduce Perugini's alleged statement. He specifically alerted the trial court that the statement was not being offered to prove the truth of the matter asserted, but rather, to show its effect on the defendant. He further referred the trial court to the correct page and section of a well known work on Connecticut evidence. Tait & LaPlante, Connecticut Evidence (1976) § 11.3 (d). The assistant state's attorney per-

sisted in his objection that "it's clearly hearsay." Again, the objection was sustained.

We recognize that the hearsay rule and the proper application of its many exceptions have long been the source of confusion among judges and lawyers alike. Nonetheless, the basic definition of hearsay is not difficult to understand. "An out-of-court statement is hearsay when it is offered to establish the truth of the matters contained therein." *State* v. *Sharpe,* 195 Conn. 651, 661, 491 A.2d 345 (1985); *State* v. *Randolph,* 190 Conn. 576, 584, 462 A.2d 1011 (1983); *State* v. *DeFreitas,* 179 Conn. 431, 439–40, 426 A.2d 799 (1980); *State* v. *Barlow,* 177 Conn. 391, 396, 418 A.2d 46 (1979). A statement offered solely to show its effect upon the hearer is not hearsay. *Counsel on Probate Judicial Conduct re: James H. Kinsella,* 193 Conn. 180, 200, 476 A.2d 1041 (1984); *State* v. *Zdanis,* 173 Conn. 189, 192 n.1, 377 A.2d 275 (1977). The defendant in this case clearly did not offer Perugini's statement in proof of the matter asserted, i.e., that if he shot Perugini, he had better kill him. Perugini's statement was in the nature of a threat, or an expression of hostility, and as such, bore directly on the reasonableness of the defendant's subsequent actions. A similar rationale applies to "proof by the defendant, in cases of assault or homicide, of communicated threats made to him by the [victim]. If offered to show his reasonable apprehension of danger it is not offered for a hearsay purpose; its value for this purpose does not depend on the truth of the statement." McCormick, Evidence (3d Ed. 1984) § 249, p. 734. We find that the trial court erred in its refusal to allow the defendant to testify to Perugini's statement, "If you shoot me you better kill me."

B

Shortly after the objection to the admission of Perugini's statement had been sustained, defense counsel,

still on direct examination, asked the defendant about his state of mind when he fired the fatal shot. The following transpired:

"Mr. Avitabile: What was your feeling or your intention or your state of mind when you fired that shot?

"Mr. Ward: Objection, self-serving, it's the same question previously asked.

"The Court: Objection is sustained.

"Mr. Avitabile: As to what, repetitious?

"The Court: As to what you asked.

"Mr. Avitabile: You're not going to allow me to ask what his state of mind was when he fired the shot, that's what I'm asking.

"The Court: His state of mind when he fired the gun?

"Mr. Avitabile: Yeah.

"Mr. Ward: It's clearly self-serving, your Honor.

"The Court: That's the problem with it."

There is no rule in this jurisdiction which prevents a witness from testifying to relevant facts within his personal knowledge merely because his testimony may be self-serving. Such an extraordinary rule presumably would disqualify as witnesses most parties in civil suits as well as the defendant in a criminal case. General Statutes § 52-145 (a) expressly provides that a "person shall not be disqualified as a witness in any action because of, (1) his interest in the outcome of the action as a party or otherwise . . . ." We have repeatedly upheld against constitutional challenge an instruction that the jury in weighing the credibility of an accused's testimony may consider his interest in the outcome of the case. *State* v. *Wright,* 198 Conn. 273, 280, 502 A.2d 911 (1985); *State* v. *Frazier,* 194 Conn. 233, 239, 478

A.2d 1013 (1984); *State* v. *Maldonado,* 193 Conn. 350, 366–67, 478 A.2d 581 (1984). This instruction is presupposed by our recognition and acceptance of the fact that the testimony of an accused may be self-serving. It is the task of the cross-examiner to discredit a witness by exposing his motive or interest in testifying. See, e.g., *State* v. *Ortiz,* 198 Conn. 220, 502 A.2d 400 (1985); *State* v. *Milum,* 197 Conn. 602, 608–609, 500 A.2d 555 (1985). The ultimate issue, credibility, is for the jury, not the court, to decide.

The governing principle with respect to this issue is that relevant evidence is admissible unless excluded for some reason of policy. "Evidence is admitted, not because it is shown to be competent, but because it is not shown to be incompetent." *State* v. *Sharpe,* supra, 659; *State* v. *Schaffer,* 168 Conn. 309, 317, 362 A.2d 893 (1975). The defendant was charged with intentional manslaughter and reckless manslaughter, in violation of General Statutes § 53a-55a.[7] His state of mind when he fired the fatal shot was relevant to his guilt under both of those subsections. Evidence of the defendant's state of mind was also relevant to the jury's resolution of his claim of justification. The "test for the degree of force in self-defense [and defense of others] is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." *State* v. *DeJesus,* 194 Conn. 376, 389 n.13, 481 A.2d 1277 (1984); *State* v. *Croom,* 166 Conn. 226, 229–30, 348 A.2d 556 (1974).[8] The defendant's testimony as to his actual belief would be relevant to this determination. We have con-

[7] See footnote 1, supra.

[8] Cf. footnote 6, supra, and accompanying text. The primary determination of reasonableness under subsection (a) is made from the perspective of the defendant. The applicability of the exceptions contained in subsection (c), however, must be determined from all the facts in evidence and is not to be viewed from the perspective of the defendant.

sistently held that mental condition is a fact, and, where relevant to an issue in the case, the witness concerned may testify directly to it. *Horowitz* v. *F. E. Spencer Co.,* 132 Conn. 373, 379, 44 A.2d 702 (1945); see *State* v. *Periere,* 186 Conn. 599, 605–606, 442 A.2d 1345 (1982); *State* v. *Savage,* 161 Conn. 445, 447, 290 A.2d 221 (1971). The defendant's testimony as to his prior mental condition was not hearsay because it concerned a fact within his own personal knowledge. His testimony with regard to this fact was no more and no less self-serving than his testimony with regard to any other fact. The trial court erred by excluding it on the ground that it was self-serving.[9]

## C

Our determination that the trial court erred in excluding Perugini's statement and in disallowing the defendant's testimony as to his state of mind when he fired the fatal shot does not necessarily require reversal. The defendant claims that the erroneous rulings deprived him of his state constitutional right to testify under article first, § 8, of the Connecticut constitution; *State* v. *King,* 187 Conn. 292, 303–304, 445 A.2d 901 (1982); as well as his due process right to present an effective defense. *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Preyer,* supra; *State* v. *Corchado,* supra, 660.

With respect to the state constitutional right to testify, we recently stated that *State* v. *King,* supra, where

[9] The prosecutor and the trial court may have been confused by the rule of evidence which bars admission *by a party of his own hearsay declarations,* because, inter alia, they are self-serving. *State* v. *McDowell,* 179 Conn. 121, 125, 425 A.2d 935 (1979); *State* v. *Penn,* 144 Conn. 148, 154, 127 A.2d 833 (1956); *State* v. *Goldberger,* 118 Conn. 444, 455, 173 A. 216 (1934); but cf. *State* v. *Anonymous (83-FG),* 190 Conn. 715, 728–29, 463 A.2d 533 (1983), and *State* v. *Dolphin,* 178 Conn. 564, 567–71, 424 A.2d 266 (1979). In this case, however, the defendant sought to testify to a fact within his personal knowledge. His testimony, while perhaps self-serving, was clearly not hearsay, and should not have been excluded.

that right was mentioned, "did not effect any fundamental change in the law." *State* v. *Wright,* supra, 280. We therefore consider the harmfulness of the erroneous rulings under the due process clause. Our inquiry, under the due process clause, is whether the erroneous exclusion of evidence "was so prejudicial to the rights of the defendant as to deprive him of a fair trial. *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980). Stated another way, the question is 'whether the claimed erroneous action of the court would have been likely to affect the result.' *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976)." *State* v. *Talton,* 197 Conn. 280, 289, 497 A.2d 35 (1985). Because both of the trial court's erroneous rulings resulted in the exclusion of evidence tending to reflect on the defendant's state of mind at the time he fired the fatal shot, we believe that the question whether the defendant received a fair trial must be answered in light of the evidence relating to that issue which was admitted at trial.

The defendant testified in great detail to the events immediately preceding the fatal shooting. He related how Flammia, Perugini and approximately ten others exited the Standing Room Only Bar and began to advance on him and his companions. He testified that some of the crowd members were armed with sticks, bottles and chains, and that he believed that "they wanted to hurt us." On cross-examination the defendant was questioned extensively concerning the warning shots he fired over the crowd. He later testified that his "purpose" in firing the warning shots was "to make them go away." The jury heard that the crowd did not disperse, that the defendant and his companions retreated to their cars, and that the crowd thereafter began to batter Magalhaes.

With regard to Magalhaes' attackers, the defendant was allowed to testify that "I thought they were going to kill him." The defendant claimed throughout his

testimony that he did not intend to shoot any of Magalhaes' attackers, and that he aimed one to one and one-half feet to the right of them. According to the defendant, he wanted to "scare them" away, and that if "they heard the bullet whiz by them they would believe they were live rounds instead of blanks." The testimony proceeded as follows:

"Mr. Ward: So the third shot you fired you claim that you were going to make believers out of them, is that right?

"The defendant: No, I don't claim that at all.

"Mr. Ward: You wanted them to hear the whiz of the bullet, didn't you?

"The defendant: Yeah.

"Mr. Ward: Or the whistling of the bullet?

"The defendant: Yes.

"Mr. Ward: Wasn't that your goal?

"The defendant: No, my goal was to get them off [Magalhaes].

"Mr. Ward: And how were you going to do that, by killing them all?

"The defendant: No.

"Mr. Ward: By making them hear the whiz of the bullet?

"The defendant: Correct."

We have considered this and other evidence offered at trial. Given the totality of the evidence, the jury was furnished an ample basis from which to draw its conclusions about the events that transpired on the evening in question, and how those events were perceived by the defendant. The ultimate issue before the jury

was whether the defendant's actions were reasonable under the circumstances. In light of the additional evidence pertaining to the defendant's state of mind that was placed before the jury, we do not believe that the erroneous exclusions of evidence deprived the defendant of either his state constitutional right to testify or his federal constitutional right to present an effective defense. Because the erroneous exclusions of evidence do not amount to a constitutional violation, it is the defendant's burden to show that the errors were harmful. *State* v. *Brown,* 187 Conn. 602, 611, 447 A.2d 734 (1982); *State* v. *Gordon,* 185 Conn. 402, 419, 441 A.2d 119 (1981); *State* v. *Ruth,* supra. In this case we find that this burden has not been met.

There is no error.

In this opinion the other judges concurred.